Opinion issued May 26, 2005
















In The
Court of Appeals
For The
First District of Texas
 

 
 
NO. 01-04-00624-CV
__________
 
TMC WORLDWIDE, L.P., Appellant
 
V.
 
RICHARD GRAY, Appellee
 

 
 
On Appeal from the 215th District Court
Harris County, Texas
Trial Court Cause No. 2004-16982
 

 
 
O P I N I O N
          Appellant, TMC Worldwide, L.P., appeals from the denial of its application for
a temporary injunction in its suit to enforce a non-competition covenant and
misappropriation of trade secrets. See Tex. Civ. Prac. & Rem. Code Ann. §
51.014(a)(4) (Vernon Supp. 2004–2005). In two points of error, TMC argues that the
trial court abused its discretion by not enjoining Richard Gray, appellee, (1) from
continuing to use TMC’s trade secrets in competition with TMC and (2) from
continuing to compete against TMC in violation of Gray’s covenant not to compete. 
We affirm.  
Background
          Glenn Atkinson was the sole owner of Automatic Insect Control Enterprises,
Inc. (AICE), a business that installed a nozzle placement system around homes that
had a time-released emission of insecticides to eliminate mosquitos and other biting
insects around the house. Atkinson explained that the business survived on referrals
and the monthly maintenance of the systems.


 
          In June 2001, Richard Gray signed a confidentiality agreement and became an
at-will marketing consultant for AICE. AICE operated under the business name
Champions Mosquito Control (“Champions”) in Houston. The confidentiality
agreement contained a covenant not to compete and provided as follows:
Whereas, [Gray] would like to receive and review confidential
information relating to the products and business of AICE, AICE agrees
to provide such information with absolute performance of the following
points:
 
1.[Gray] agrees to accept and maintain in confidence all trade
secrets, formulas and other confidential business information
which [Gray] receives during consultation with AICE and further
agrees to protect the same against disclosures to unauthorized
persons.
 
2.In addition, [Gray] agrees not to use, directly or indirectly, for
[his] own benefit or for the benefit of any other person, firm,
corporation, etc., any confidential business information, trade
secrets or formulas disclosed to [Gray] during or as a result of
consultation with AICE or review of AICE’s confidential
information. It is understood that such information may be
disclosed by [Gray] to employees of [his] company when
necessary in furtherance of the relationship which exists between
[Gray] and AICE; however, all such employees who receive such
information shall agree to the terms of the AGREEMENT.
 
3.These obligations shall not apply to any information which is in
the public domain as evidenced by printed publication and shall
terminate if such information shall become public in such manner,
except for such publications caused by an act or omission on
[Gray’s] part in breach of the AGREEMENT. In addition, these
obligations shall apply to any information which is presently in
[Gray’s] possession or which may be disclosed to third persons
without [Gray’s] solicitation.
 
4.Notwithstanding the termination of this Agreement, [Gray] agrees
that for a period of three (3) years following any termination they
[sic] will not directly or indirectly in any capacity either as owner,
partner, shareholder, broker, dealer, agent, employee, consultant,
or otherwise, engage in the business of providing any program,
service, equipment or product similar or competitive with the
operation of AICE.
 
5.AICE and [Gray] agree that the foregoing restrictions which
pertain to the three (3) year period immediately following the
termination of this agreement, are reasonable, but recognize that
damages in the breach of these restrictions will be difficult to
ascertain and, therefore, agree that in addition to and without
limiting any other remedy or right AICE may have, AICE shall
have the right to an injunction against [Gray] issued by a Court of
competent jurisdiction enjoining any such breach.
 
          Atkinson testified that, when he started working for AICE, Gray signed this
confidentiality agreement containing a non-compete clause, and he was given a
customer list.


 However, Gray testified that he was not given a customer list until
June 2002, one year after he started working for AICE.


 In October 2002, Gray
stopped coming to work. He never quit and was not fired. 
          John Fleming, who lived in Corpus Christi, contacted Atkinson because
Fleming was interested in getting a system from Champions. Don Carlson, a
Champions consultant, went to Fleming’s home and told him about the system. In
November 2002, Carlson returned to give Fleming an estimate, and, this time, Carlson
was accompanied by Gray. Gray and Carlson informed Fleming that they were
“branching off” of the company and starting their own business to compete with
Atkinson. They gave Fleming an estimate from Champions, and then under-cut it
with a bid from their new venture, Affordable Automatic Mosquito Control (AAMC). 
Fleming testified that Gray told him that Champions was “going under.” Fleming
bought a system from AAMC. Fleming testified that Gray inquired if Fleming would
be interested in becoming a distributor for AAMC. Fleming testified that he declined.
          In January 2003, Fleming started his own mosquito business, TMC Worldwide,
L.P., to service south Texas residents. During the first quarter of 2003, Fleming
became aware of the fact that Gray possessed Champions’s customer list. Fleming
asked to see the list, but Gray would not let him. In November 2003, Fleming bought
Champions’s assets, including its customer list that contained more than 3000 names
from across the United States. 
          In February 2004, Fleming received a telephone call from Mrs. Orloff, one of
Fleming’s customers, who informed him that she had received a letter from Gray.
Mrs. Orloff faxed a copy of the letter to Fleming. The letter was generically addressed
to “Resident,” stated the various services offered by Gray’s company, and offered a
price for insecticide refills that was less than TMC’s price. Fleming kept Mrs. Orloff
as his customer by offering her a discount on the price of her insecticide refills.
Fleming also testified that he later learned of at least one former Champions client,
Mrs. West, who was now using Gray’s services. 
          TMC filed suit, in which it alleged that Gray had breached his confidentiality
agreement by using trade secrets–TMC’s customer list–and by actively soliciting
TMC’s customers in violation of the non-compete clause. TMC also alleged that
Gray misappropriated trade secrets. In its petition, TMC sought a temporary
restraining order, a temporary injunction, and a permanent injunction. Gray’s
confidentiality agreement with AICE and a solicitation letter from Gray on AAMC
letterhead were attached as exhibits to the petition.
          In his answer, Gray generally denied the allegations and specifically stated that
the covenant not to compete was unenforceable because (1) there was no separate
enforceable agreement as is required by Texas Business and Commerce Code section
15.50(a),


 (2) Gray was an at-will employee, and (3) there was no geographic
restriction in the covenant not to compete and no reasonable limitation on the scope
of the activities to be restrained. Gray further denied misappropriating any trade
secrets.
          Three months after denying the temporary injunction and two weeks after TMC
filed its appellate brief, the trial court issued the following combined findings of fact
and conclusions of law.
1.Richard Gray, (“Gray”), executed a Confidentiality Agreement
(the “Agreement”) with Automatic Insect Control Enterprises,
Inc. (“AICE”) on or about June 10, 2001.
 
2.Gray was first given confidential information in the form of the
AICE customer list (“Customer List”) in June 2002, an entire
year after the execution of the Agreement.
 
3.The restrictions in the Agreement were not reasonably limited.
 
4.There is no geographic restriction in the Agreement.
 
5.The Customer List contains customers located in most states in
the United States.
 
6.The restrictions in the Agreement are not a reasonable limitation
on the scope of activity to be restrained and the Agreement’s
limitations did impose a greater restraint than was necessary to
protect AICE’s business interests.
 
7.There was no separate, enforceable agreement between AICE and
Gray for the primary purpose of obligating the [sic] Gray to
render personal services.
 
8.In the alternative, AICE and Gray had an at-will, verbal
commissioned sales agreement for Gray to provide sales services
to AICE.
 
9.AICE’s former owner, Glen Atkinson (“Atkinson”) provided the
Customer List to all contract sales personnel and at least one
installation personnel.
 
10.The Customer List was not marked “CONFIDENTIAL.”
 
11.Out-of-Date issues of the Customer List were not collected and/or
destroyed by Atkinson or any other officer or employee of AICE.
 
12.AICE nor Atkinson made any effort to collect the Customer List
from personnel or contractors who left employment with AICE.
 
13.Atkinson knew that Gray was competing with AICE at least as
early as April/May 2003.
 
14.It is not known whether the 16 customers common to the
Customer List and Gray’s customer list were solicited by Gray,
or sought Gray out because of a prior relationship with Gray.
 
15.TMC Worldwide, L.P. (“TMC”) purchased the assets of AICE.
 
16.TMC’s General Partner is John Fleming (“Fleming”).
 
17.Fleming was aware of the Customer List in Gray’s possession
before TMC acquired the assets of AICE.
 
18.Fleming requested a copy of the Customer List in Gray’s
possession, from Gray, before TMC acquired the assets of AICE.
 
19.Atkinson took no or insufficient action that would indicate a
concern for protecting the distributed copies of the Customer List.
 
20.The Agreement does not comport with the covenant not to
compete provisions of Tex. Bus. Com. Code §§15.50-15.52[.]
 
21.AICE’s promise to provide proprietary information to Gray is
illusory because there was no separate, enforceable agreement for
the primary purpose of obligating the [sic] Gray to render
personal services.
 
22.An at-will services agreement cannot be an enforceable
agreement for purposes of enforcing a covenant not to compete
because the parties always retain the option of discontinuing
services for any reason.
 
23.Injunctive relief may be based on the application of general
equitable principles or on express authorization contained in a
statute.
 
24.Procedures governing courts of equity are controlling as long as
they are not in conflict with Texas statutes or rules of procedure.
 
25.In the absence of an enforceable agreement not to compete, TMC
is not entitled to an injunction preventing Gray from soliciting
clients with whom Gray established a relationship during his
tenure with AICE.
 
26.TMC must establish that the Customer List is entitled to trade
secret protection until the trial on the merits.
 
27.To establish that the Customer List is entitled to trade secret
protection until the trial on the merits, TMC must show a
probability of success in proving that the Customer List is entitled
to trade secret protection.
 
28.TMC did not show a probability of success in proving that the
Customer List is entitled to trade secret protection pending trial
on the merits because of 1) the extent to which the Customer List
was known by employees and others involved in the business, 2)
the lack of measures taken by AICE to guard the secrecy of the
Customer List, and 3) the ease or difficulty with which the
Customer List could be properly acquired or duplicated by others. 

(Emphasis added.) TMC does not challenge specific findings of fact. See
McGalliard v. Kuhlmann, 722 S.W.2d 694, 696 (Tex.1986) (holding unchallenged
findings of fact are binding unless contrary is established as matter of law or there is
no evidence to support finding); Aldine Indep. Sch. Dist. v. Ogg, 122 S.W.3d 257, 265
(Tex. App.—Houston [1st Dist.] 2003, no pet.). 
Temporary Injunction
          In two points of error, TMC argues that the trial court abused its discretion by
not enjoining Gray from (1) continuing to use TMC’s trade secrets in competition
with TMC and (2) continuing to compete against TMC in violation of Gray’s
covenant not to compete.
          A temporary injunction’s purpose is to preserve the status quo of the
litigation’s subject matter pending a trial on the merits. Walling v. Metcalfe, 863
S.W.2d 56, 57 (Tex. 1993). A temporary injunction is an extraordinary remedy and
does not issue as a matter of right. Id. To obtain a temporary injunction, the
applicant must plead and prove three specific elements: (1) a cause of action against
the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent,
and irreparable injury in the interim. Butnaru v. Ford Motor Co., 84 S.W.3d 198, 204
(Tex. 2002). An injury is irreparable if the injured party cannot be adequately
compensated in damages or if the damages cannot be measured by any certain
pecuniary standard. Id.
          The decision to grant or deny a temporary injunction lies in the sound
discretion of the trial court, and the court’s ruling is subject to reversal only for a
clear abuse of discretion. Walling, 863 S.W.2d at 58. We must not substitute our
judgment for the trial court’s judgment unless the trial court’s action was so arbitrary
that it exceeded the bounds of reasonable discretion. Johnson v. Fourth Ct. App.,
700 S.W.2d 916, 918 (Tex. 1985). In reviewing an order granting or denying a
temporary injunction, we draw all legitimate inferences from the evidence in a
manner most favorable to the trial court’s judgment. CRC-Evans Pipeline Int’l v.
Myers, 927 S.W.2d 259, 262 (Tex. App.—Houston [1st Dist.] 1996, no writ). Abuse
of discretion does not exist if the trial court heard conflicting evidence, and evidence
appears in the record that reasonably supports the trial court’s decision. Davis v.
Huey, 571 S.W.2d 859, 862 (Tex. 1978); Myers, 927 S.W.2d at 262. When, as here,
specific findings of fact and conclusions of law are filed and a statement of facts is
before the appellate court, the findings will be sustained if there is evidence to
support them, and the appellate court will review the legal conclusions drawn from
the facts found to determine their correctness. See Myers, 927 S.W.2d at 263. 
Non-Compete
          In point of error two, TMC contends that the trial court abused its discretion
by failing to enjoin Gray from continuing to compete against TMC in violation of
Gray’s covenant not to compete. We disagree.
          The Covenants Not to Compete Act, Texas Business and Commerce Code
Annotated sections 15.50-.52 (Vernon 2002), governs the enforceability of the
involved covenant not to compete, as well as the procedures and remedies in an
action such as this one. See Light v. Centel Cellular Co. of Texas, 883 S.W.2d 642,
644 (Tex. 1994). The enforceability of a covenant not to compete is a question of law
for the court. Id.
          Section 15.50 reads in relevant part:
[A] covenant not to compete is enforceable if it is ancillary to or part of
an otherwise enforceable agreement at the time the agreement is made
to the extent that it contains limitations as to time, geographical area,
and scope of activity to be restrained that are reasonable and do not
impose a greater restraint than is necessary to protect the goodwill or
other business interest of the promisee.

Tex. Bus. & Com. Code Ann. § 15.50(b) (Vernon 2002). In the present case, we
are concerned only with the first of the two criteria for enforceability of a covenant
not to compete—whether the covenant not to compete involved here was “ancillary
to or part of an otherwise enforceable agreement at the time the agreement [was]
made.” Under section 15.50, the relevant point in time is the moment the agreement
is made; the issue is whether, “at the time the agreement is made,” there exists other
mutually binding promises to which the covenant not to compete is ancillary or part
and parcel. Light, 883 S.W.2d at 644.
          Gray was an “at-will” employee of Champions. An “otherwise enforceable
agreement” can emanate from at-will employment, but only so long as the
consideration for a promise is not dependent on a period of continued employment. 
Myers, 927 S.W.2d at 263. A promise dependent on a period of continued
employment would be illusory because it fails to bind the promisor, who always
retains the option of discontinuing employment in lieu of performance. Light, 883
S.W.2d at 644-45.



          An “otherwise enforceable agreement” is a contract and, as such, must be
supported by consideration. Tom James of Dallas, Inc. v. Cobb, 109 S.W.3d 877, 885
(Tex. App.—Dallas 2003, no pet.). “Consideration is a present exchange bargained
for in return for a promise. It consists of either a benefit to the promisor or detriment
to the promisee.” Roark v. Stallworth Oil & Gas, Inc. 813 S.W.2d 492, 496 (Tex.
1991) (emphasis added) (internal citations omitted). 
          There must be a contemporaneous exchange of consideration between the
parties at the time the “otherwise enforceable agreement” is executed for the promise
not to be illusory. See id. Under section 15.50, the time relevant to this
determination “is the moment the agreement is made; the issue is whether, ‘at the time
the agreement is made,’ there exists other mutually binding promises to which the
covenant not to compete is ancillary or part and parcel.” Myers, 927 S.W.2d at 263;
see Light, 883 S.W.2d at 644-45. The fact that Atkinson gave new confidential
information and training to Gray some time after entering into the agreement will not
suffice; we must evaluate the consideration given at the time the agreement was
made. See Olander v. Compass Bank, 172 F. Supp. 2d 846, 854 (S.D. Tex. 2001). 
When we evaluate the agreement at the time it was made, Champions’ provision of
confidential information and training to Gray before signing the agreement will not
support its promises in the agreement. See Roark, 813 S.W.2d at 496 (“Consideration
is a present exchange bargained for in return for a promise.” (Emphasis added.)); see
also Jordan Leibman & Richard Nathan, The Enforceability of Post-employment
Noncompetition Agreements Formed After At-will Employment Has Commenced: The
“Afterthought” Agreement, 60 S. Cal. L. Rev. 1465, 1528-29 (1987) (“If anything
in the classical law of contracts is clear, it is that past [or future] consideration is not
good consideration. Any exchange has to be contemporaneous by definition, because
the promise and the consideration for that promise must serve as reciprocal
conventional inducements.”).
          A promise to give confidential information is not sufficient. Light, 883 S.W.2d
at 647 n.14. The employer must actually give the confidential information in return
for the employee’s promise not to disclose it. The Texas Supreme Court stated in
Light that, “if an employer gives an employee confidential and proprietary
information or trade secrets in exchange for the employee’s promise not to disclose
them, and the parties enter into a covenant not to compete, the covenant is ancillary
to an otherwise enforceable agreement.” Light, 883 S.W.2d at 647 n.14 (emphasis
added). 
          Accordingly, a promise to provide confidential information is illusory and
cannot be the basis of an “otherwise enforceable agreement” unless (1) the employer
promises to deliver the confidential information to the employee and (2) the employer
actually delivers the confidential information at or near the time the employee makes
the promise to keep the information confidential. See Wright v. Sport Supply Group,
Inc. 137 S.W.3d 289, 297 (Tex. App.—Beaumont 2004, no pet.) (court found that
employer’s promise to provide confidential information was not illusory where,
subsequent to signing the agreement, the employer, on a daily basis, made
confidential information available to the employee.)


 We only need to find one
non-illusory promise to establish an otherwise enforceable contract. 
          In this case, TMC asserts that Champions’ promise to provide Gray with
confidential information in return for his promise to keep the information confidential
was non-illusory and thus was the basis of an “otherwise enforceable” contract that
was ancillary to the covenant not to compete. However, Gray testified that he did not
receive this confidential information until one year after he started working for
Champions. The trial court believed this testimony and made findings of fact
consistent with Gray’s recollection of the events. Because the record reflects that
there was no contemporaneous exchange of consideration for the contract—the
confidential information was not provided close to the time that the agreement was
made—Champions’ promise was illusory and, thus, cannot be the basis of an
otherwise enforceable contract ancillary to the covenant. See Roark, 813 S.W.2d at
496; Wright, 137 S.W.3d at 297. 
          In support of its argument, TMC relies on the holdings in Ireland v. Franklin,
950 S.W.2d 155 (Tex. App.—San Antonio 1997, no writ) and Curtis v. Ziff Energy
Group, Ltd., 12 S.W.3d 114 (Tex. App.—Houston [14th Dist.] 1999, no pet.). This
reliance is misplaced because neither opinion discusses the issue of whether and to
what extent the employer’s delay in complying with a promise to deliver confidential
information will render the promise illusory. To the extent that these opinions can
be read to hold that, in an at-will employment relationship, there is no requirement
that the consideration be contemporaneously exchanged to make a promise to provide
confidential information not illusory, we decline to follow these opinions. 
          Accordingly, we hold that the trial court did not abuse its discretion in denying
TMC’s temporary injunction relating to the covenant not to compete. We overrule
point of error two.
Trade Secrets
          In its first point of error, TMC argues that the trial court abused its discretion
by not enjoining Gray from continuing to use TMC’s trade secrets–the customer list–
in competition with TMC. We disagree. 
          Gray provided AAMC’s customer list, which contained approximately 80
names, 16 of which were also found on TMC’s list. Gray testified that he obtained
the customers through his relationship with builders and landscaping companies who
gave him references. He also testified that he received some referrals from other
customers and from Terry Clark, a former Champions installer, and Don Carlson, a
former Champions salesperson. He testified that some of his customers sought him
out because of his prior relationship with them and because they were dissatisfied
with the service provided by TMC. Gray testified that Mrs. West, a former
Champions client, was one such customer. Notably, TMC does not challenge the trial
court’s finding that it was unknown if the 16 customers common to TMC’s list and
Gray’s customer list were solicited by Gray through his use of Champions’ customer
list or if they sought Gray out because of a prior relationship with him. Gray testified
that he has not shared the Champions list with anyone, he has not made any copies
of the list, the list is currently in the possession of his attorney, and no one has asked
him to return it.
          In contrast, Fleming testified that, on December 10, 2003, two days after he
bought Champions, he met with Gray. Fleming testified that Gray was angered by
the news of Fleming’s decision to purchase Champions, and he informed Fleming that
he had already “taken over a hundred customers from Champions,” and that “[Gray’s]
goal was to take one hundred customers a year” and increase it to “approximately
500 a year.” 
          Fleming testified that Gray told him that he had Champions’ customer list and
that “he would do with it whatever he blank well pleased.” Fleming also testified that
Gray told him that he was going to use the Champions list as a guide to target
neighborhoods for mass mailings. Fleming said that, at the December 10th meeting,
he requested that Gray not use the list in direct competition with Fleming.


 Fleming
testified that, after he purchased Champions, he asked Gray for the list and Gray
never returned the list to him.
          At the temporary injunction hearing, Fleming provided evidence that only one
of TMC’s 3000 customers, Mrs. Orloff, had received a mass mailing from Gray, and
he testified that Orloff is still a TMC customer. Fleming also testified that he “lost”
 Mrs. West to Gray as a customer because she was unhappy with TMC’s service.
             In light of the conflicting testimony regarding Gray’s conduct and the lack
of any evidence that Gray used the Champions customer list to obtain the 16
customers that are common to both Gray’s list and TMC’s list, we hold that the trial
court did not abuse its discretion in denying TMC’s temporary injunction relating to
the alleged trade secrets. See Wright, 137 S.W.3d at 292 (“The trial court does not
abuse its discretion when basing its decision on conflicting evidence, nor does it
abuse its discretion so long as some evidence of substantive and probative character
exists to support its decision.”) The trial court did not abuse its discretion when it
found that “TMC did not show a probability of success in proving that the Customer
List is entitled to trade secret protection pending trial on the merits.” See Butnaru,
84 S.W.3d at 204. We overrule point of error one.
 Conclusion
          We affirm the trial court’s denial of the temporary injunction.
 
 
                                                                        George C. Hanks, Jr.
                                                                        Justice

Panel consists of Justices Nuchia, Hanks, and Higley.